

# Greenbaum Rowe
# Smith ◼ Davis |LLP

### COUNSELORS AT LAW

**METRO CORPORATE CAMPUS ONE**
**P.O. BOX 5600**
**WOODBRIDGE, NJ  07095-0988**
**(732) 549-5600     FAX (732) 549-1881**

DELIVERY ADDRESS: 99 WOOD AVENUE SOUTH, ISELIN, NJ  08830-2712

INFO@GREENBAUMLAW.COM
WWW.GREENBAUMLAW.COM

ROSELAND OFFICE:
75 LIVINGSTON AVENUE
SUITE 301
ROSELAND, NJ 07068-3701
(973) 535-1600
FAX (973) 535-1698

NEW YORK OFFICE:
750 THIRD AVENUE
9TH FLOOR
NEW YORK, NY 10017
(212) 847-9858

RAYMOND M. BROWN
PARTNER
(732) 476-3280 - DIRECT DIAL
(732) 476-3281 - DIRECT FAX
RBROWN@GREENBAUMLAW.COM

November 28, 2016

**VIA ECF AND FEDERAL EXPRESS**

Hon. Ronnie Abrams, U.S.D.J.
United States District Court
Thurgood Marshall
United States Courthouse
40 Foley Square
New York, NY 10007

        **Re:**    **U.S. v. Norman D'Souza**
                 **16 CR 253 (RA)**

Dear Judge Abrams:

    This firm represents the defendant, Norman D'Souza ("Norman").  He is scheduled for

sentencing before Your Honor on December 8, 2016.  We submit this Sentencing Memorandum,

which articulates the bases for the request that Norman be given a sentence of home confinement

pursuant to 18 U.S.C. §3553(a).

## I.    **INTRODUCTION**

    Norman has pled guilty to one count of conspiracy to commit bank fraud, in violation of

18 U.S.C. § 1349, and one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. §

1343 and 18 U.S.C. § 1349.  The Probation Department has concluded that Norman "did not

appear to personally profit from the instant offense" and "it does not appear that greed was a

Greenbaum Rowe
Smith ⬛ Davis | LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 2

factor for D'Souza."[1]  Indeed, Norman did not personally arrange for the loans, and had no control over how the loan proceeds were spent.  In fact, Norman was not a shareholder of his former employer, Munire Furniture Corp. ("MFC") and had no control over MFC in any respect. It is apparent that Norman's motivation for the offense conduct was not greed but the desire to save his job and the jobs of his co-workers at his former employer MFC.

Norman, an accountant, admits that he participated in the conspiracy to commit fraud, and fully accepts responsibility for his offense conduct.  Indeed, since the outset of this matter, Norman has attempted to fully cooperate with the Government.   Specifically, despite the Government's decision not to give Norman a 5K1 letter, Norman continued his efforts to cooperate with the Government through an in-person proffer session, an attorney proffer session, a meeting and several phone calls between counsel and the U.S. Attorney's office.  Further, on August 3, 2016 and August 9, 2016, counsel, at Norman's instruction, provided written submissions, with documents, of further evidence of criminal activity of others.  Through these efforts, Norman provided the Government with substantial evidence of other crimes outside of the offense conduct, as well as proof of the involvement of others in the offense conduct.

Additionally, Norman has cooperated with the main victim of the offense conduct, Bank Leumi, USA ("Bank Leumi").  Norman and his counsel met with Bank Leumi representatives on multiple occasions in an "effort to provide information and assistance to Bank Leumi to aid in its efforts to recover funds."[2]  This assistance includes speaking with Bank Leumi both before and

---

[1] Presentence Report ("PSR"), attached as Exhibit C, at 24.
[2] September 28, 2016 Letter from Bank Leumi., attached as Exhibit D.

Greenbaum Rowe
Smith ≋ Davis | LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 3

after Norman pled guilty. During these meetings, Norman provided Bank Leumi with evidence of an additional scheme which led to additional sources of potential recovery of which Bank Leumi "was not previously aware and back-up information supportive of Bank Leumi's right of recovery."[3] As a result of Norman's efforts, Bank Leumi can potentially recover all or substantially all of its loss.[4]

While Norman accepts responsibility for his offense conduct, it is undisputed that he allowed himself to be manipulated by an "extremely persuasive" and "extremely convincing" person by the name of Munir Hussain ("Hussain"), the President and majority shareholder of MFC.[5] This is not surprising in light of the fact that Hussain was able to manipulate sophisticated investors, such as Kurt Olender, Esq. ("Olender"), general counsel to and minority shareholder of MFC, and Olender's friends, into investing millions of dollars in MFC, some mere days prior to MFC filing for bankruptcy. Further, Hussain was able to persuade Bank Leumi into continuing to extend financing to MFC for months, despite several breaches of the loan agreements between MFC and Bank Leumi.

At a deposition in January 2016, Olender testified under oath that Hussain "exercised complete control over Norman" and "dictated to Norman what Norman was to do."[6] Hussain did so by exploiting Norman's "excessive drive to secure the approval and acceptance of others,"[7] as

---

[3] Id.
[4] See November 23, 2016 letter from Bank Leumi attached hereto as Exhibit E.
[5] See Transcript of the January 15, 2016 deposition of Kurt Olender ("Olender Dep."), attached hereto as Exhibit G at 102:25-103:11
[6] See id. at 40:18-40:23.
[7] Report of Catherine M. Barber, Ph.D. ("Dr. Barber Report"), attached hereto as Exhibit F, at 2; 9.

Greenbaum Rowe
Smith ⬛ Davis|LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 4

well as his "overdeveloped sense of responsibility for others."[8]   Norman's "pathological
caretaking," arose from the dire circumstances of his upbringing in excruciating poverty in the
chawls[9] of Mumbai, India.  These personality traits made him susceptible to the belief that no
harm would befall the victims and that his participation could save his job and the jobs of his
fellow employees.[10]  It was this naiveté that led Norman to take part in a criminal scheme that
was completely outside every aspect of his character.   Hussain exploited this extraordinary
naiveté and related personality traits not only to convince Norman to participate in a scheme
Norman knew to be wrong, but to do so in a manner that left Norman in a position to be the only
one charged in connection with the schemes perpetuated by MFC, despite the involvement of
others.

This sentencing brings before the Court a man with no history of misconduct described as
a "sincere and faithful follower of the Catholic Faith"[11] who "unabashedly" showers "steadfast

---

[8] Id. at 2.
[9] A chawl is "a large building divided into many separate tenements, offering cheap, basic accommodation" to
laborers.   Oxford Dictionaries, "chawl," https://en.oxforddictionaries.com/definition/chawl. (last visited
November 28, 2016).   See also India What Is It Like to Live in a Chawl, Vinati Singh,
http://www.slate.com/blogs/quora/2013/06/25/india_what_is_it_like_to_live_in_a_chawl.html, attached as Exhibit
M, for a description of life in a chawl, which Norman brought to counsel's attention as a strikingly similar account
as to his recollection of life in a chawl.
[10] See Dr. Barber Report (Exhibit F) at 8-9.
[11] See Letter of Sister Clare Yosco attached as Exhibit L(79).   See also PSR (Exhibit C) at ¶ 49. See generally
Exhibit L, Rev. Charles T. O'Connor of the Catholic Community of St. Cecilia; Letters of Jacob Almeida, Jason
Banji, Karen Barretto, Leonie Barretto, Martin Barretto, Anita Chonkar, Brian Cook, Lily Daniel, Gangadhar Desu,
Brandon D'Souza, Crystal D'Souza, Cyril D'Souza, Darlene D'Souza, Ernest D'Souza, Gladwin D'Souza, Joyce
D'Souza, Patricia D'Souza, Rashma D'Souza, Stephen D'Souza, Simantini Eddy, Edmond Fernandes, Edmond and
Anitha Fernandes, Michelle Fernandes, Stanley Gnana, Clara Gomes, Richard Gomes, Alen Gonsalves, Joseph M.
Kunnel, Esq., Angelo Lobo, Vinita Lobo, Bromin Menezes, Felix Menezes, Stacey Mustapha, Dianne Nunes,
Robert Omansky, Marceline S. Pinto, Celsius Rebello, Rachel Rebello, Eddy Sayeed Ph.D., Sujit Shetty, and
Vincent Tavormina.

Greenbaum Rowe
Smith ■ Davis | LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 5

love" on "his wife, his two daughters and most of all his aging parents,"[12] who nevertheless participated in a criminal scheme to defraud a bank of millions of dollars. This nuanced picture of culpability without venality raises the question of "why would Norman participate in such a scheme?" The answer can only be found by delving deeply into the factors of 18 U.S.C. § 3553(a)(1) concerning the nature and circumstances surrounding the offense and the life and character of Norman.

In light of these contradictory circumstances, and all the other factors it considered, the Probation Department recommended a sentence of 24 months' imprisonment for Norman, which is less than fifty percent of the minimum imprisonment concomitant with Norman's Guidelines score.[13] The Probation Department made this recommendation without the benefit of knowing Norman's continuing efforts to assist Bank Leumi, which should provide an opportunity for the bank to recoup a substantial portion, and potentially all, of its losses. Furthermore, the PSR was released prior to the defense being able to provide the expert report of Dr. Catherine Barber.

In light of these additional circumstances, the defense believes the Probation Department's recommendation exceeds the objective of 18 U.S.C. § 3553(a) that a sentence should be "sufficient, but not greater than necessary[.]" The defense requests that Norman receive a sentence of home confinement.

---

[12] See Letter of Leonie Barretto attached as Exhibit L(6). See also letter of Joyce D'Souza (attached as Exhibit L(24)) and Exhibit L generally.
[13] See PSR (Exhibit C) at 24.

Greenbaum Rowe
Smith ■ Davis | LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 6

## II.    **PROCEDURAL HISTORY**

On April 1, 2016, Norman pled guilty before Your Honor to a two-count Information charging him with one count of conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349, and one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1349.[14] As part of the plea agreement, Norman and the Government stipulated that Norman's score for purposes of applying the sentencing guidelines is **24**, corresponding to a sentence of 51 to 63 months' imprisonment.[15] The parties further agreed that neither would seek a downward or upward departure from the stipulated guidelines range; however, they could seek a sentence outside the stipulated guidelines range pursuant to 18 U.S.C. § 3553(a).[16]    Finally, the parties agreed that the forfeiture amount would be subject to further discussion before being decided by Your Honor at sentencing.

On September 8, 2016, the Probation Department issued the final PSR.  The Probation Department found that "the nature and circumstances of the offense, as well as the defendant's personal characteristics justify, a non-guidelines sentence."[17]    Specifically, the Probation Department recommended a sentence of 24 months' imprisonment, followed by three years' supervised release.[18] However, the defense believes that the Probation Department did not go far enough in its non-guidelines sentencing recommendation, and requests that Your Honor sentence

---

[14] A copy of the Information is attached hereto as Exhibit A.
[15] A copy of the plea agreement entered into by Norman and the Government (the "Plea Agreement") is attached as Exhibit B.
[16] See id. at pg. 3.
[17] See PSR (Exhibit C) at 24.
[18] Id.

Greenbaum Rowe
Smith ■ Davis | LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 7

Norman to home confinement. Finally, Norman accepts the financial consequences of his

offense conduct, bearing responsibility for both a substantial restitution order and forfeiture

judgment. While counsel believes the defense has a valid argument under United States v.

Peters, 732 F.3d 93 (2d Cir. 2013) that Norman should not be subject to any forfeiture judgment,

Norman has instructed counsel to abandon any such argument. Therefore, Norman has entered

into an agreement with the Government regarding forfeiture.

## III.    FACTUAL BACKGROUND

### A.    Norman D'Souza's Offense Conduct.

Norman violated the law by providing, on behalf of MFC, fraudulent borrowing base

certificates ("BBCs") to Bank Leumi pursuant to loan agreements between Bank Leumi and

MFC. Further, as a part of the effort to keep MFC afloat, Norman prepared financial projections

he knew to be false for Echelon Furniture, Inc. ("Echelon") to provide to Gas City, Indiana, to

maintain financing from the city. Norman acknowledges that his signing of the fraudulent BBCs

and preparing the fraudulent projections led to reliance by the lenders in continuing to provide

funding.

### B.    Norman D'Souza's Background

A defendant's history and core characteristics are important, as they bear upon the

Court's analysis under 18 U.S.C. § 3553(a) in explaining the offense conduct and shaping an

appropriate sentence. In Norman's case, his history and characteristics provide insight as to how

Greenbaum Rowe
Smith ▨ Davis | LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 8

someone with such a high character in all other aspects of life could fall into the offense conduct,

and will assist the Court in determining an appropriate sentence.

The facts reveal that Norman acted to save his job, and more importantly, the jobs of his

fellow co-workers. The accuracy of this picture of a man motivated by concern for others is

supported by the fact that prior to his involvement with this offense he lived a life of extreme

selflessness.

**C.     Early Life in India and Core Characteristics of Norman D'Souza**

Norman was born on July 4, 1965 in Kalyan, India, a small community on the outskirts of

Mumbai. Norman is the middle child of three boys. Norman's father, Stanley, was a welder

who traveled around the country looking for work. Very early in Norman's life, his father was

away for months at a time, visiting his family only twice a year.

Norman's family was extremely poor, and barely had the means to survive.[19]    Until

Norman was about eleven the family lived in a chawl. There is nothing in the United States that

is comparable to a chawl. It is over-crowded, filthy, infested and disease ridden.[20]

Chawls are usually two stories with about ten to twenty tenements, referred to as "kholis"

on each floor.[21] The D'Souza family resided in a typical kholi, consisting of one room, divided

into two. One room served as the kitchen and washroom, and the other room served as the living

room, bedroom, work room, and all other purpose room. Norman's uncles and grandparents

---

[19] See Letter of Stephen D'Souza attached as Exhibit L(29).
[20] See *India What Is It Like to Live in a Chawl*, Vinati Singh, http://www.slate.com/blogs/
quora/2013/06/25/india_what_is_it_like_to_live_in_a_chawl.html attached as Exhibit M.
[21] See id.

Greenbaum Rowe
Smith ⬛ Davis | LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 9

stayed with his family for extended periods of time, resulting at times in eight to ten people living in a one room kholi.

The chawl had a long hallway that connected the kholis. At the end of this hallway stood the community latrines that the chawl residents shared. The latrine did not have running water, so Norman's family brought its own potted water to pour down the toilet after use. The latrines were cleaned once a year and the septic tank emptied less frequently. According to Norman's brother Stephen D'Souza, the stench of urine and feces permeated throughout the chawl.[22]

Norman's wife, Rashma, describes her experience visiting the chawl in which Norman grew up as follows:

> After we got married, Norman and his Mom wanted to introduce me to his childhood neighbors where Norman was born and lived till he was 11 years old. I could not believe how small their one room house was in which he lived with his 2 brothers, parents, grandparents and uncles. That one small room was divided by a half wall. On one side of the wall, they had a small kitchen and washing area. The washing area had a plastic curtain for privacy and drums of water around it. This washing area was used for bathing, washing clothes, and washing utensils. Other side of the wall was their living room, bed room and study area all in one. He showed me the common toilets located in the corner of the buildings that they used since there was no toilet in their room. I could not even dare to go closer since it was so dirty and disgusting and I could get the stench from where I was standing. I wondered how they used the toilets. Norman told me how much he hated his childhood days in the chawl but at the same time it was the motivating factor to do well in his life.[23]

---

[22] See Letter of Stephen D'Souza, Exhibit L(29).
[23] Letter of Rashma D'Souza, Exhibit L(27).

Greenbaum Rowe
Smith ■ Davis | LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 10

Norman's early life experiences in dire poverty led him to develop the strong personality traits "of taking responsibility for the well-being of others" or "pathological caretaking."[24] From an early age, Norman's "pathological caretaking" was evident.

In Norman's early teenage years, he began teaching "tutions," (tutoring in the United States). Instead of keeping the money for himself, or spending it like most teenagers, he gave every rupee he earned to his mother to help with the family expenses.[25]

At about this same age, Norman saw a vendor walking the streets utilizing a large basket, which he carried on his head. Norman could not bear to watch the man struggle carrying the basket on his head, so he gave the vendor his bicycle, which Norman's family had saved for, to assist in the vendor in his work.[26] Norman did this knowing that his family could never afford to replace the bicycle.

Norman's strong commitment to his faith leads him to continue to be selfless in the giving of his time, talent and treasure to his community today. He is an usher at Mass, and even volunteers to serve at the Masses for which he was not scheduled. Norman has also been an active member of the Knights of Columbus for six years. He assumed a leadership role in the Knights of Columbus shortly after joining, and many of the other members of the Council "look

---

[24] See Dr. Barber Report, (Exhibit F), at 10.
[25] Letter of Stanley D'Souza, attached as Exhibit L(28).
[26] Letters from Norman's mother Joyce D'Souza (attached as Exhibit L(24)) and Norman's brother Stephen D'Souza (attached as Exhibit L(29)).

Greenbaum Rowe
Smith ▧ Davis | LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 11

up to him as a true Knight and gentleman."[27]  Whenever there is an event occurring at his Church

or community he is always one of the first people to volunteer his time and efforts.

Norman's generosity extends beyond the giving of his time.  He is described as having a

"very kind and generous heart."  He is also dedicated to helping orphan children in India.[28]  The

letters of support submitted on behalf of Norman are filled with first person accounts of his

efforts to help others.  Rachel Rebello, a childhood friend of his daughter Darlene, recounts how

when she was ten years old, Norman bought her a brand-new bicycle, unprompted, when he

found out hers had broken.[29]  Angelo and Vinita Lobo describe two specific instances in which

they experienced his "kindness and love without expecting anything in return."[30]  They describe

the circumstances surrounding Angelo's fall and back injury on Christmas 2002.  The next day,

Norman and his family visited them with lunch and presents for their children.  Mr. and Ms.

Lobo also recall a time when Norman learned that their daughter did not have a bed, so he gave

them one of his daughter's beds with a new mattress and bed linens.

Brenda Rebello recalls a time where she was explaining to Norman that the television the

St. Cecilia's Bible study group used was very old and would only work intermittently.  Before

she knew it, Norman had traveled home and brought back his own large screen television from

his living room to donate to the church.[31]

---

[27] Letter from Vincent P. Tavormina, attached as Exhibit L(73).
[28] See Letter from Dorothy Lewis, attached as Exhibit L(44)
[29] Letter from Rachel Rebello, attached as Exhibit L(64)
[30] Letters from Angelo Lobo and Vinita Lobo, attached as Exhibits L(45) and (46).
[31] Letter from Brenda Rebello, attached as Exhibit L(62).

Greenbaum Rowe
Smith ■ Davis | LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 12

Several people tell of circumstances during and following Superstorm Sandy, when Norman assisted them by opening his home, and subsequently lending them his generator, despite the fact that he too had lost power. Martin and Karen Barretto state how the storm left them without power for almost three weeks. Norman opened his home to them so that they could take hot showers, and thereafter gave them his generator saying they "were more in need of it."[32] Edmond and Anitha Fernandes recall how during the storm they were without power for a week, and Norman insisted they stay with his family. He provided them with meals during their stay, and then lent them his generator upon their return home.[33]

Furthermore, Norman has reached into his own pocket to help several friends financially when they were in times of need. Venkataraman Iyer recalls two instances where he fell into a financial crisis and Norman loaned him money without judgment or question.[34] Maria E. Zapata describes Norman as "a man with a great willingness to help," stating that Norman has lent her money two or three times when she needed it most.[35] Norman also loaned Sujit Shetty money on two separate occasions. Once, so that Mr. Shetty could purchase his first car shortly after moving to the United States in 1997, and a second time so that Mr. Shetty could purchase his first house.[36] Stacey Mustapha describes Norman as "the sort of man that will help anyone in

---

[32] Letters from Karen Barretto and Martin Barretto, attached as Exhibits L(5) and (7).
[33] Letter from Edmond and Anitha Fernandes, attached as Exhibit L(34).
[34] Letter from Venkataraman Iyer, attached as Exhibit L(41).
[35] Letter from Maria E. Zapata, attached asExhibit L(80).
[36] Letter from Sujit Shetty, attached as Exibit L(71).

Greenbaum Rowe
Smith ■ Davis | LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 13

need whether monetary or advice.  If it monetary, he does it from his own pocket."[37]  Norman
did reach into his own pocket to help Ms. Mustapha through difficult times.

Norman does all this without seeking credit or praise.  That is why Felix Menezes
describes Norman as a "silent giver never fishing for praise or recognition, his humility is truly a
testimony of a giver who does not seek reward."  Martin Barretto states that Norman is "known
amongst his social circles as one who would go beyond what is called for in order to help another
in their time of need even if it's detrimental to his own interests."[38]

We offer these glimpses into Norman's drive to put others ahead of himself, even to his
own detriment, because this character trait led Norman into the offense conduct, as he was afraid
if he did not participate in the fraud scheme he and everyone else at MFC would lose their jobs.

**D.      Secondary Education and Early Work Life.**

After his family left the chawl, Norman attended the University of Bombay.  In order to
afford the tuition, Norman continued to work while attending college.  After Norman graduated
from the University of Bombay, he began working toward his Chartered Account qualification in
India, which he achieved in 1990.

While working for an accounting firm for three years, a prerequisite to becoming a
Chartered Accountant, he met his wife Rashma.  Norman walked Rashma home after late nights
working together so that she would not have to walk home alone, and later went to Rashma's

---

[37] Letter from Stacey Mustapha, attached as Exhibit L(54).
[38] See letters from Felix Menezes, ChFC and Martin Barretto, attached as Exhibits L(49) and (7).

Greenbaum Rowe
Smith ⬛ Davis | LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 14

home at lunch breaks to have lunch with her family.[39]  The two grew very close, and eventually

fell in love. Despite the fact that their families came from different social "castes" and were

different religions,[40] the two married in 1992.

### E.    Immigration to The United States and Pre-MFC Employment

After approximately one year of marriage, Norman and Rashma were presented with an

opportunity to work in the United States.   Norman had encountered a "friend" from his

childhood who had already immigrated to the United States.  This "friend" offered Norman an

accounting job in Dallas, Texas, and sponsored him for his H1-B work visa.

The couple thought they were in pursuit of the "American Dream;" however, what

ensued was more of a nightmare.[41]   Norman was promised a $30,000 per year accounting.

However, within days of arriving in Dallas, TX, he was sent to Los Angeles to work for his

"friend's" brother at $18,000 per year.  This new employer, who owned 19 fast food restaurants,

took Norman's passport and deducted the costs of the plane tickets from his reduced salary.

When Norman asked for a moderate increase in salary to $20,000 per year, the employer refused,

but instead offered him a position as a night manager in one of the restaurants earning $4.25 per

---

[39] See letters from Anita Chonkar and Vasant Chonkar, attached as Exhibits L(9) and (10).
[40] Rashma's family was from a higher "caste" than Norman's.  Further, Rashma and her family are orthodox Hindu, while Norman and his family are Catholic.  These caste and religious differences meant that they almost certainly could never marry.  In India at that time, arranged marriages were the norm, where parents would "select the spouse for their children by checking the horoscope, caste, and family background."  Prior to Rashma marrying Norman, no one in her family had ever entered into marriage d'amour.  Norman allayed all of these concerns by demonstrating his genuine nature, good morals and character.  He further allayed Rashma's family's concerns by demonstrating his respect for their Hindu values, culture and traditions.  In fact, Norman has essentially become a de facto Hindu all while practicing Catholicism.  See Letters from Rashma D'Souza (attached as Exhibit L(27)) and her parents Anita Chonkar (attached as Exhibit L(9)) and Vasant Chonkar (attached as Exhibit L(10)).
[41] See Letter of Rashma D'Souza (attached as Exhibit L(27)) and Dr. Barber Report (Exhibit F), at 3.

Greenbaum Rowe
Smith ≋ Davis LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 15

hour. For two years, Norman spent most weekdays working as an accountant during business hours and then working until midnight as a manager at a restaurant to earn enough to support his family. Even after learning that his employer could not lawfully withhold his passport, he allowed himself to essentially be an indentured servant as he was unable to "muster the assertiveness to confront his employer."[42] Finally, still unable to directly confront his employer, Norman asked for his passport so that he could process the necessary paperwork for his mother to visit from India, and never returned it.

By this time, the expiration date of his H-1B visa was approaching. Norman decided to forego pursuing a CPA, believing that he could not make it in America. In August 1996, he and Rashma packed up their baby and returned to India to begin looking for new jobs.

Shortly after returning to India, Norman learned of a software company recruiting accountants in New Jersey. When asked about his salary requirements, Norman requested $27,000 per year. This request was so small, that the employer observed that he pays more to employees in lower positions than the one for which Norman had applied. The employer offered Norman the job, at a higher salary than Norman had requested, and he and his family once again moved back to the United States.

Norman, Rashma and their daughter Darlene lived in a one-bedroom apartment together, when Rashma became pregnant with the couple's second daughter, Crystal. While Rashma was pregnant, Norman's brother Stephen lost his job and could no longer afford the rent for his apartment. Norman, always thinking of others, insisted that Stephen, his wife, and son all move

---

[42] See Barber Report (Exhibit F), at 3.

Greenbaum Rowe
Smith ▨ Davis LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 16

into Norman and Rashma's one-bedroom apartment.[43]    Although Norman was the only member

of the household with a job, he welcomed his brother's family into his home.    "He never

complained or made [them] feel uncomfortable[.]"[44]  The six of them lived together in that one-

bedroom apartment for six months until Stephen was able to find work.

 This story reflects the core characteristics of Norman's life.  His wife describes him as

"my love, my life, my everything."[45]  His eldest daughter, Darlene, describes him as having "the

unique quality of selfless love that touches every person" with whom he interacts.[46]  Darlene is

concerned because Norman "holds our entire family together[,]" and states that without him, she

does not know how their family will survive, as they have only been able to "keep going" this

past year due to the generosity of others around them.[47]  His youngest daughter, Crystal says that

she "always look[s] to him for guidance through everything" she does, and that she is fearful of

losing her dad.[48]  Crystal suffers from nightmares due to the thought of her father not being with

her family.[49]

 Norman's dedication to his family does not stop at just his wife and daughters.  He also

provides support, both financially and otherwise, to his aging parents in India.[50]  He supports his

parents, and until his father's recent health concerns, Norman brought his parents to the United

---

[43] See Letters of Stephen D'Souza, Rashma D'Souza, Lydia D'Souza (attached as Exhibits L(29), (27) and (25)) and Dr. Barber Report, (Exhibit F) at 4.
[44] See Letter of Lydia D'Souza, attached as Exhibit L(25).
[45] Letter of Rashma D'Souza, attached as Exhibit L(27).
[46] Letter from Darlene D'Souza, attached as Exhibit L(21).
[47] Id.
[48] Letter from Crystal D'Souza, attached as Exhibit L(19).
[49] Id.
[50] See letter of Norman's parents Joyce D'Souza (attached as Exhibit L(24)) and Stanley D'Souza (attached as Exhibit L(28)).

Greenbaum Rowe
Smith ⬛ Davis | LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 17

States for months at a time, supporting them during their visits.  In January 2016, Norman's father was admitted to an ICU due to his respiratory issues.  The fact that Norman could not travel to India to see his father, assist with his caretaking, and provide his mother with support still haunts him.  Additionally, he treats his father-in-law and mother-in-law as he would his own parents, and they feel as if they gained another son with him.[51]

Norman is also a deeply religious man, who is a "sincere and faithful follower of the Catholic Faith."[52]  Since moving to New Jersey, he has attended Mass every Sunday with his family, and frequently attended Mass during the week as well.[53]  Norman's love of his family and his dedication to his faith are so evident to all who know him that almost every person who wrote a letter on his behalf made reference to one or both.

**F.    Employment at MFC**

In 2003, the company for which Norman worked went bankrupt.  Norman spent the next five years working unhappily as a freelance consultant.  He "never felt a part of the company" for which he was consulting.

In early 2009, an opportunity for Norman to work full-time for one employer arose when he met and was hired by Hussain to work at MFC.  Norman was seduced by Hussain's stories. Hussain is "extremely persuasive," and when he began speaking to people, he was an "extremely

---

[51] See Letters from Rashma D'Souza (attached as Exhibit L(27)) and her parents Anita Chonkar and Vasant Chonkar, attached as Exhibits L(9) and (10).
[52] Letter from Sister Clare Yosco, attached as Exhibit L(79).
[53] Letter Rev. Charles T. O'Connor, JCL, attached as Exhibit L(56).

Greenbaum Rowe
Smith ▩ Davis | LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 18

convincing" raconteur leading people to believe in him.[54]   Norman became one of those

believers.  Hussain spoke of growing up poor in Pakistan, being drawn to the smell of wood at a

young age, and working as a carpenter in Kuwait, starting at the age of thirteen.[55]  In describing

Hussain's capacity to persuade, Olender labeled these same stories as "literally out of the

playbook."[56]   Olender was persuaded by Hussain to invest in MFC, and to urge his friends to

invest as well.  Hussain was so persuasive that he convinced one of Olender's friends to invest in

MFC just days before it declared bankruptcy.

Norman was hired to be the Vice President of Finance, but Hussain "controlled every

aspect" of MFC.[57]  Olender explained that Hussain:

> controlled the relationship with the customers; he controlled the
> relationship with the suppliers; he controlled the relationship with
> the manufacturers; he oversaw the sales team; he oversaw the
> finance department; he controlled pricing with the customers; he
> negotiated the pricing with the suppliers; he negotiated the pricing
> with the manufacturers.  He handled virtually every aspect of this
> business as it pertained to anything that involved the finance of the
> business because he would let no one else have their hand in it.[58]

Hussain bragged to Olender that he told Norman what to do.[59]  Hussain claimed that he

did not "know how to make the report, that's what Norman is for," but he "dictated to Norman

---

[54] See Olender Dep. (Exhibit G), at 102:25-103:11.
[55] See Dr. Barber Report (Exhibit F), pg. 4.
[56] Olender Dep. (Exhibit G), at 44:21-24.
[57] Id. at 39:16-17.
[58] Id. at 39:16-40:3.
[59] Id. at 40:20-21.

Greenbaum Rowe
Smith ◼ Davis | LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 19

what Norman was to do."[60]   Therefore, when MFC could no longer handle Hussain's lavish

spending[61] and support a failing Echelon, Hussain turned to Norman to falsify BBCs.

Hussain knew that Norman was an easy mark, and he played upon Norman's two most

dominant character traits: his excessive drive to please people in authority and his overdeveloped

sense of responsibility for others.  He stressed to Norman that more than fifty employees would

lose their jobs if Norman did not prepare and sign falsified BBCs knowing that Norman would

want to try to save those jobs.   Further, Hussain convinced Norman that he was close to

obtaining new investors in MFC, who would allow MFC to pay Bank Leumi without the bank

ever suffering a loss.[62]  Norman knew that preparing and signing these documents was wrong,

but he feared that without it MFC would shut down, and all of its employees, including him,

would lose their jobs.

Norman was so naïve and vulnerable to Hussain that he never realized that Hussain was

shifting the responsibility for certain tasks to Norman, while distancing himself from potential

liability.  He prohibited Norman from speaking to MFC's lenders, vendors, customers, or the

other investors about anything but routine matters.  Further, while directing Norman to prepare

false BBCs, with information he provided to Norman, he would insist that he not be copied on e-

mails transmitting them or discussing them.  Hussain took great lengths to try to eliminate any

paper trail of this fraud to him.

---

[60] Id. at 40-21-25.
[61] Hussain purchased an airplane for MFC, funded Echelon with MFC's funds, and provided himself and his family
with off-the-books cash payments.
[62] See Dr. Barber Report (Exhibit F), at 5.

Greenbaum Rowe
Smith ■ Davis LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 20

### G.    Remorse

In September 2014, Bank Leumi discovered that MFC had been submitting false BBCs and ceased funding MFC. This resulted in MFC failing to make payroll, and forced MFC to file immediately for bankruptcy. Norman's deep remorse for his offense conduct led him to do as much as he could from that point forward to try to make things right.

Since September 2014, Norman has demonstrated that deep remorse through a willingness to assist the Government and Bank Leumi in any way possible. Throughout MFC's bankruptcy proceedings, Norman worked closely with, and provided substantial assistance to, the Chief Restructuring Officer ("CRO") of MFC to identify the full scope of the fraud perpetrated.[63]

Norman further demonstrated his remorse through his attempts to cooperate with the Government in its ongoing investigation into MFC's conduct. On June 3, 2015, Norman met with the government for a proffer session. As discussed in Section IV(B)(1)(iii) of this memorandum, this session resulted in the Government determining that it would not provide Norman with a 5K1 letter. However, this discussion has not discouraged Norman from continuing to attempt assist the Government and Bank Leumi. On or about December 22, 2015, prior counsel, at the direction of Norman, made an attorney proffer to the Government. On June 6, 2016, current counsel, at the direction of Norman and despite the Government's candid reassurance that it would not be giving Norman a 5K1 letter, met with the Government to provide further evidence of potential criminal activity of others. On August 3, 2016 and August 9, 2016, counsel provided the Government with additional submissions concerning direct

---

[63] See Letter from Bank Leumi dated September 28, 2016, attached as Exhibit D.

Greenbaum Rowe
Smith ⬛ Davis | LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 21

evidence of criminal conduct of Hussain, which the defense believes either the Government had

not received or had not properly evaluated.[64]

In addition to his efforts to assist the Government, Norman has taken significant steps to

assist Bank Leumi in its efforts to become whole. Norman and his counsel met with Bank Leumi

representatives on multiple occasions in an "effort to provide information and assistance to Bank

Leumi to aid in its efforts to recover funds."[65] This assistance includes speaking with Bank

Leumi both before and after Norman pled guilty. During these meetings, Norman provided Bank

Leumi with evidence of an additional scheme which led to additional sources of potential

recovery of which Bank Leumi "was not previously aware and back-up information supportive

of Bank Leumi's right of recovery."[66]

## IV.  LEGAL ARGUMENTS

### A.  The Advisory Nature of The Sentencing Guidelines Permits The Court to Craft A Non-Guideline Sentence for Norman D'Souza By Taking Into Account The Facts And Circumstances Surrounding His Offense Conduct And His Extreme Remorse Evidenced by His Continual Attempts to Provide Assistance to Bank Leumi And The Government.

Norman's plea agreement calls for a stipulated Guidelines score of 24, which corresponds

to an advisory sentence of 51-63 months in prison. As discussed below, an individualized

assessment of the facts surrounding Norman's offense, his nature and characteristics under 18

U.S.C. §3553(a) presents a complex and compelling story that supports a non-guideline sentence.

In fact, the Probation Department, after examining the offense conduct and personal

---

[64] Submissions of August 3, 2016 and August 9, 2016 attached as Exhibits I and J.
[65] Bank Leumi Letter Dated September 28, 2016 attached as Exhibit D.
[66] Id.

Greenbaum Rowe
Smith ▩ Davis LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 22

characteristics pursuant to §3553(a), "found several mitigating factors" and recommended a non-guidelines sentence of 24 months in prison. We agree with the Probation Department that a non-guideline sentence is warranted in this matter. However, we respectfully assert that, for a variety of reasons, a sentence of home confinement is a more appropriate sentence for Norman.

Since the U.S. Supreme Court's 2005 decision in U.S. v. Booker, it is well-settled that the Guidelines are advisory and now serve as only one of several factors that are to be considered by a District Court when crafting an appropriate sentence for a criminal defendant. See U.S. v. Booker, 543 U.S. 220 (2005); Kimbrough v. United States, 128 S. Ct. 558, 564 (2007); Gall v. United States, 128 S. Ct. 586, 594 (2007). The Guidelines cannot be used as a substitute for a sentencing court's independent determination of a just sentence based upon consideration of the statutory sentencing factors. See Nelson v. United States, 129 S.Ct. 890 (2009); Spears v. United States, 129 S.Ct. 840 (2009). Moreover, the Supreme Court has held that its cases "do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable." Nelson, 129 S.Ct. at 892.

Consequently, post-Booker, District Courts have the ability to exercise broad discretion when imposing sentences, subject to the requirement that they begin their analysis with a proper Guidelines range calculation, fully consider the factors set forth in 18 U.S.C. § 3553(a), and consider all other grounds properly advanced by the parties at sentencing. Pepper v. U.S., 562 U.S. 476, 480 (2011). In essence, the Court must make "an individualized assessment based on the facts presented." Gall, 128 S.Ct. at 597. In making an individualized assessment of a given

Greenbaum Rowe
Smith ▧ Davis | LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 23

defendant, courts are encouraged to consider "the widest possible breadth of information" in order to ensure that the punishment will suit the individual defendant. <u>Pepper</u>, 562 U.S. at 488; <u>Wasman v. U.S.</u>, 468 U.S. 559, 564 (1984). In fashioning a sentence that fits an individual defendant, it also well settled that "[d]istrict courts enjoy considerable discretion in identifying the grounds that can justify a non-Guidelines sentence." <u>U.S. v. Jones</u>, 531 F.3d 163, 172 (2d Cir. 2008); see also <u>U.S. v. Wernick</u>, 691 F.3d 108, 118 (2d. Cir. 2012).

The Supreme Court has repeatedly reaffirmed the principle that "the punishment should fit the offender and not merely the crime." <u>Pepper</u>, 562 U.S. at 487-488 (quoting <u>Williams v. New York</u>, 337 U.S. 241, 247 (1949). Given the facts of this matter, a comprehensive analysis of the factors set forth in 18 <u>U.S.C.</u> §3553(a) leads to the conclusion that Norman is not the type of offender who requires incarceration.

**B.        Analysis of the Section 3553(a) factors**

In exercising its enhanced sentencing discretion post-<u>Booker</u>, a District Court must now impose a sentence "sufficient, but not greater than necessary" to comply with the various purposes of sentencing set forth in 18 <u>U.S.C.</u> §3553(a)(2). In determining an appropriate sentence for a defendant, §3553(a) directs the Court to consider several factors. In pertinent part, these factors are:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed –

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

Greenbaum Rowe
Smith ☒ Davis | LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 24

      (B)    to afford adequate deterrence to criminal conduct;

      (C)    to protect the public from further crimes of the defendant; and

      (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)    the kinds of sentences available;

(4)    the kinds of sentence and the sentencing range established for

      (A)    the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;

(5)    any pertinent policy statement –

      (A)    issued by the Sentencing Commission pursuant to 28 U.S.C. § 994(a)(2) that is in effect on the date the defendant is sentenced…;

(6)    the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)    the need to provide restitution to any victims of the offense.

      See 18 U.S.C. §3553(a).

Application of the §3553(a) factors to this case supports the issuance of a non-guideline sentence. A comprehensive analysis of these factors in this case, including facts that the Probation Department did not have the opportunity to consider, supports the defense's request for a sentence of home confinement.

Greenbaum Rowe
Smith ■ Davis|LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 25

### 1.     The Nature and Circumstances of the Offense

Pursuant to 18 U.S.C. §3553(a)(1), the Court must consider the "nature and circumstances of the offense" in crafting an appropriate sentence for the defendant. Norman fully admits that signing BBCs that he knew to be false and providing assistance to Echelon to hide its tenuous financial condition from Gas City were criminal acts. Norman accepts full responsibility for his criminal conduct and has demonstrated genuine remorse for his actions. It should be noted that his criminal acts were non-violent in nature and that, aside from the offense conduct, Norman has led a law abiding, even praiseworthy, life with no criminal history.

While he acknowledges the criminality of his conduct, the circumstances under which Norman's offense conduct took place and his motivation for committing the offense conduct are factors that should be considered by the Court when crafting an appropriate sentence for a defendant. See Wisconsin v. Mitchell, 508 U.S. 476, 485 (1993) ("The defendant's motive for committing the offense is one important factor."). As correctly noted by the Probation Department in the PSR, Norman's offense conduct was not motivated by greed and, in fact, he did not benefit financially from it.[67] Rather, Norman acted out of a desire to keep MFC from going out of business so his job and the jobs of dozens of other MFC employees could be saved. According to Dr. Catherine Barber, Norman's motivation is entirely consistent with his "overdeveloped sense of responsibility for others."[68] In addition to the effect the extreme poverty of his childhood had on Norman's fear of losing his own job, his wish to help others avoid

---

[67] PSR (Exhibit C), at 24.
[68] Dr. Barber Report (Exhibit F), at 2. In fact, Dr. Barber notes that Norman's trait of excessive warmth is often referred to as "pathological caretaking" in clinical literature. Id. at 10.

Greenbaum Rowe
Smith ■ Davis | LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 26

unemployment was also a significant factor in "his willingness and motivation to accede to Munir's directives."[69]

Norman never intended his conduct to harm the victims of MFC's schemes. In fact, throughout the period of his offense conduct, based on assurances provided to him by Hussain, Norman expected MFC to obtain additional financing that would enable it to repay Bank Leumi and turn the business around, without any harm to Bank Leumi.

From the time Norman arrived at MFC, the company was in dire financial circumstances due to the lavish personal spending and poor business decisions made by Hussain.[70] In order to keep MFC from going out of business, Hussain directed that a series of frauds take place. The frauds were carried out by Hussain personally, but also by executives at MFC and outside vendors over which Hussain was able to exert considerable influence.[71] Norman admits to being one of the executives at MFC that helped execute the schemes directed by Hussain. In Norman, Hussain had an executive that he knew he could manipulate. According to the sworn testimony of Olender, Hussain controlled every aspect of MFC and bragged to Olender and others about how he controlled Norman.[72]

---

[69] Id. at 5. As reported by Rashma D'Souza to Dr. Barber, "I do know that Norman got very close to the people in the company. All those people were poor, living paycheck to paycheck, and he always wanted to help them. He's always been that way." Id. at 7.

[70] Among the decisions made by Hussain that placed MFC in dire financial circumstances were the purchase of a private plane and expensive cars, the siphoning off cash from MFC and the construction of Echelon's manufacturing facility in Gas City, Indiana. See Olender Dep. (Exhibit G) at 34:4-10 and Dr. Barber Report (Exhibit F), at 4. Also attached as Exhibit L(30) is the letter of Henry Duran who was the pilot of MFC's aircraft.

[71] See Olender Dep. (Exhibit G), at 40:18-23 and 88:8-21.

[72] Id. at 40:18-23.

Greenbaum Rowe
Smith ⊠ Davis | LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 27

Hussain's considerable influence over Norman stemmed from the fact that Hussain knew that Norman cared deeply about the people that worked at MFC, and that Norman would not quit if he was made to believe that doing so would cause these people to lose their jobs. Rather, Hussain knew that Norman would do everything possible to prevent MFC from going out of business.[73] Early in the period of his offense conduct, when Norman objected to signing a BBC containing false information, Hussain explicitly told him that if he did not sign the BBC, MFC would default on its obligation with Bank Leumi and MFC would be forced out of business. In hindsight, Norman realizes he should have quit MFC as soon as Hussain instructed him to sign and submit a false BBC to Bank Leumi, but he was unable to do so. More than fearing for his own job, Norman could not handle the assertion that he could be responsible for dozens of other people losing their jobs - and Hussain knew it.[74]

Disregarding the consequences of his conduct for himself and the victims of MFC's schemes, Norman did what Hussain asked of him, including signing and submitting false BBCs to Bank Leumi. While Norman knew that his conduct was wrong, he did it to save his job and the jobs of the other employees at MFC. Norman never intended Bank Leumi or the City of Gas City to suffer any harm as a result of his conduct. In fact, right up until MFC filed for

---

[73] See Dr. Barber Report (Exhibit F), at 5.
[74] It would be disingenuous to assert that Norman did not at some level consider the personal short-term impact of quitting MFC when Hussain first asked to sign and submit a false BBC to Bank Leumi. However, before joining MFC, Norman earned roughly the same salary working as a consultant. The defense contends that he could have returned to providing accounting services in a consulting capacity relatively quickly were he to have left MFC.

Greenbaum Rowe
Smith ⬛ Davis│LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 28

bankruptcy, Norman hoped that Hussain would be able to obtain additional financing or otherwise turn the business around.

It was a crime for Norman to help perpetuate the frauds committed by MFC. However, the circumstances surrounding Norman's offense conduct were extremely unusual.

### i.    The History and Characteristics of Norman D'Souza

Section §3553(a)(1) also directs a district court to evaluate the "history and characteristics of the defendant" in determining the proper sentence for that individual. The Supreme Court has consistently emphasized that "[h]ighly relevant--if not essential--to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." Williams v. New York, 337 U.S. 241, 247 (1949); see also Pepper v. U.S., 562 U.S. 476, 488 (2011). Information regarding Norman's life and core characteristics are especially essential in this case.

If there was ever a case where the Court should use its considerable discretion to sentence a defendant with a guideline score of 24 to home confinement, this is that case. Norman is objectively different than most other defendants charged with bank fraud. As noted in the PSR, Norman's criminal conduct was not motivated by greed and he did not receive any financial benefit as a result of his criminal conduct. Rather, Norman acted primarily out of his concern for others. Norman's compassion for others is a dominant character trait that has existed throughout his life and has its origins in the extreme poverty in which he was raised. As noted by Dr. Barber, the extreme poverty of Norman's early life not only motivated Norman to please his

Greenbaum Rowe
Smith ■ Davis|LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 29

employer to keep his own job, but was also a strong motivating force to help other people keep their jobs.[75]   Growing up in a chawl outside of Mumbai, India, Norman was surrounded by human suffering.[76]   A naturally sensitive person, seeing people suffer in extreme poverty has had a profound effect on Norman his entire life.[77]   Even from an early age, the trauma of growing up in a chawl inspired in Norman a determination to help others in need.   Throughout his life, while focused on taking care of the needs of others, he often overlooks or disregards his own needs.

It is impossible in this submission to touch on all the instances that Norman went out of his way to go above and beyond for others in need.   The dozens of letters submitted to Your Honor with this Sentencing Memorandum offer a poignant but finite glimpses into the types of things that Norman has done for people throughout his life.   He has opened his home to people,[78] provided financial support to friends[79] and family members[80] and routinely given away his personal possessions without request.[81]   The common thread in Norman's life is that he is there for people when they need it most – oftentimes ignoring his own needs.   After Superstorm Sandy in October 2013, Norman's neighborhood was without power.   Norman not only opened his

---

[75] See Dr. Barber Report (Exhibit F), at 11.
[76] See Letters of Rashma D'Souza and Stephen D'Souza, attached as Exhibits L(27) and (29).
[77] See Letter of Rashma D'Souza, attached as Exhibit L(27).
[78] See Letters from Lydia D'Souza (attached as Exhibit L(25)), Rashma D'Souza (attached as Exhibit L(27)), and Stephen D'Souza (attached as Exhibit L(27)). Karen Barretto (attached as Exhibit L(5)), Martin Barretto (attached as Exhibit L(7)), and Edmond and Anitha Fernandes (attached as Exhibit L(34)).
[79] See Letters from Venkataraman Iyer (attached as Exhibit L(41)), Sunit Shetty (attached as Exhibit L(71)), Stacey Mustapha (attached as Exhibit L(54)), and Maria E. Zapata (attached as Exhibit L(80)).
[80] See Letters from Norman's parents Joyce D'Souza (attached as Exhibit L(24)) and Stanley D'Souza (attached as Exhibit L(28))
[81] See Letters from Joyce D'Souza (attached as Exhibit L(24)), Stephen D'Souza (attached as Exhibit L(27)), Brenda Rebello (attached as Exhibit L(62)), Angelo Lobo (attached as Exhibit L(45)), and Vinita Lobo (attached as Exhibit L(46)).

Greenbaum Rowe
Smith 🅢 Davis|LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 30

home to several other families, but he also subsequently lent his generator to them, despite not having power himself.[82]

Sadly, the facts of Norman's offense conduct illustrate his otherwise admirable characteristics in the worst possible light. The life-long instinct that led Norman to selflessly provide for others stopped him from quitting MFC and caused him to continue following the instructions of Hussain, even though he knew they were wrong. To be clear, Norman blames himself for his conduct that has brought him before Your Honor. He should have known—as he does now—that there was no legitimate reason to participate in the frauds perpetuated by MFC. Although he is the only person that has been charged in connection with MFC's frauds, he accepts responsibility for his conduct and understands that his own poor decisions led to this point.

Norman has already paid a tremendous price due to his criminal conduct. Norman's family means the world to him, and his guilty plea in this matter has rendered him unable to do the one thing he yearns to do the most, take care of his family.[83] Norman has one daughter in college, with a second prepared to begin in the near future. Any sentence of imprisonment may profoundly impact their ability to pursue this higher education. This is further compounded by the fact that Rashma must now attempt to maintain mortgage payments on the family's home with only her salary. Further, Norman and Rashma cannot sell the family home at this time given the impending financial judgments associated with this case.

[82] See Letters from Karen Barretto (attached as Exhibit L(5)), Martin Barretto (attached as Exhibit L(7)), and Edmond and Anitha Fernandes (attached as Exhibit L(34)).
[83] See generally character letters attached as Exhibit L.

Greenbaum Rowe
Smith ☒ Davis | LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 31

Additionally, Norman has been unable to travel to India to care for and pay respects to two men in his family that he loves the most – his father, Stanley D'Souza and his uncle, Edwin D'Souza.  Growing up, Norman was extremely close to his Uncle Edwin.  As a young adult, Norman lived with him while attending college.  In October 2016, Edwin passed away. Norman's father has been seriously ill for several months, including a hospitalization in an ICU in January 2016.  He is unable to travel to the United States.  Recently, since the death of his brother Edwin, the health of Norman's father has been in steady decline.

As someone who is determined to be there for others, especially those in his family, the fact that Norman was unable to be there for his Uncle Edwin while he was gravely ill, and was unable to say goodbye by attending his funeral, is devastating.  The prospect of being incarcerated and not being able to see his father again is something that regularly brings Norman to tears.

Despite taking steps to temper his naturally selfless nature, Norman's desire to help others remains intact.  In this case, the remorse he feels as a result of his criminal conduct has heightened the responsibility he feels to assist the Government and Bank Leumi.

As evidence of his acceptance of his responsibility and remorse, counsel offers a detailed analysis of the extent to which Norman has attempted to atone for his criminal conduct by assisting Bank Leumi pursue avenues of financial recovery and providing the Government information relating to the full scope of MFC's schemes.

Greenbaum Rowe
  Smith ▨ Davis | LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 32

ii.    **Norman D'Souza's Continual Efforts to Assist Bank Leumi**

From the time it became apparent to Norman that Bank Leumi was going to suffer losses because of the fraudulent conduct of MFC, Norman has done everything in his power to assist Bank Leumi in pursuing sources of financial recovery. Norman's attempts to assist Bank Leumi pre-date MFC's Bankruptcy, which was filed in September 2014, and have continued through to the present. As a result of information provided by Norman to Bank Leumi, additional sources of potential recovery have been identified. Pursuit of these sources may result in a substantial recovery, and could even make Bank Leumi whole. Norman's desire to assist Bank Leumi is motivated by his genuine feelings of remorse and acceptance of responsibility, as his restitution and forfeiture obligations are unaffected by sources of recovery he provides to Bank Leumi. Norman's efforts to assist Bank Leumi, described below, are compelling evidence of Norman's true character and should be part of the Court's analysis of Norman pursuant to §3553(a).

In or about April 2015, Norman met with representatives of Bank Leumi to fully disclose the facts surrounding his conduct and the conduct of others at MFC, which resulted in the losses sustained by Bank Leumi. This session, attended by Norman, his attorney at the time and several representatives of Bank Leumi, lasted several hours. Thereafter, between April 2015 and March 2016, Norman, through counsel, periodically communicated with Bank Leumi in an effort to provide any assistance that he could. After he pled guilty before Your Honor, Norman more fully immersed himself in the details of the frauds committed by MFC, in order to provide Bank Leumi with additional possible sources of financial recovery.

Greenbaum Rowe
Smith ▨ Davis|LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 33

  Norman took a fresh look at MFC's books and records and attempted to provide potential avenues of recovery that only someone who had worked at MFC would be able to recognize. Norman spent countless hours reviewing MFC's books and records, trying to understand and unravel the conduct of Hussain, other MFC employees and certain large customers. He worked until he was satisfied that he had a comprehensive understanding of the total fraud committed on Bank Leumi. What he found was startling.

  Norman was able to confirm that, at Hussain's direction, MFC violated its agreements with Bank Leumi by means other than the fraud in which he partook. Specifically, it became clear that MFC defrauded Bank Leumi by immediately breaching a Subordination Agreement[84] that Bank Leumi entered into with MFC and another of MFC's lenders, an individual who was the President of one of MFC's largest customers (hereinafter this individual and his company are collectively referred to as "TCV" – short for The Certain Vendor).[85] Indeed, the immediate coordination between MFC and TCV to actively violate the agreement made it apparent that Hussain and TCV never intended to follow it. Significantly, the Subordination Agreement with Bank Leumi provided that TCV agreed to not be repaid on his loan to MFC until Bank Leumi had been repaid all funds it loaned to MFC.[86] After reviewing various documents, it became apparent that TCV and MFC worked together to secretly pay interest on TCV's loan in violation of the Subordination Agreement through off-the-books credits against TCV's accounts

---

[84] A redacted copy of the Subordination Agreement is attached hereto as Exhibit K.
[85] Bank Leumi anticipates commencing litigation against TCV in the near future. At the request of Bank Leumi, the defense has agreed not to identify TCV in this filing. See Bank Leumi's letter from Novembe 23, 2016 attached as Exhibit E.
[86] Subordination Agreement (attached as Exhibit K), at ¶1, ¶2.

Greenbaum Rowe
Smith ▧ Davis │LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 34

receivable with MFC. In fact, in September 2013, TCV insisted that MFC's undisclosed monthly credits to TCV be doubled, as a condition of TCV agreeing to a reaffirmation of the Subordination Agreement. Again, no credits or other method of repayment were allowed pursuant to the terms of the Subordination Agreement.

In addition to payments from MFC to TCV made in express violation of the Subordination Agreement they had signed with Bank Leumi, Norman identified a second loan between MFC and TCV that was never disclosed to Bank Leumi. This previously undisclosed loan was an off-the-books loan made by TCV to MFC. As reflected in the documents provided to Bank Leumi, MFC paid monthly interest on this loan, through additional off-the-books credits to TCV's accounts receivable with MFC, both before and during the time of the Subordination Agreement. In total, it appears that approximately $918,750 was paid by MFC to TCV towards the interest on the two loans during the period of the Subordination Agreement.[87]

The significance of TCV's breach of the Subordination Agreement is undeniable as it provides a clear cause of action for Bank Leumi against TCV. According to the Subordination Agreement, TCV agreed to indemnify and hold Bank Leumi harmless:

> "from and against any loss, claim, costs and damages, however arising, by reason of any action taken or grant of any credit by the Bank in reliance on this agreement before the Bank shall have received written notice from the Creditor or termination of this agreement by operation of law."[88]

---

[87] Norman calculated this amount by taking the combined monthly loan "payments" beginning in March 2011 and adding them up through August 2014. Therefore, for March 2011 through August 2013, a period of 29 months, the monthly total was $18,750 ($12,500 for the "on-the-books" loan and $6,250 for the "off-the-books" loan). For the remainder of 2013 and for the period of 2014 prior to MFC filing for bankruptcy, a period of 12 months, the monthly total was $31,250 ($25,000 for the "on-the-books" loan and $6,250 for the "off-the-books" loan).
[88] See Subordination Agreement (Exhibit K), at ¶5.

Greenbaum Rowe
Smith ▨ Davis|LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 35

In light of this language and clear breach of the Subordination Agreement by TCV, Bank Leumi

has a strong claim against TCV for the damages it sustained as a result MFC's default.   In

addition, there is a strong argument that TCV's conduct constitutes fraud in the inducement,

which would potentially give rise to substantial damages under New York law.

Norman identified TCV as a potential source of recovery for Bank Leumi and presented

the theories on which to proceed against him.   Bank Leumi did not know of this potential source

of recovery before Norman provided it. [89]   As explained in Bank Leumi's supplemental letter to

the Court of November 23, 2016, the theories of recovery against TCV are the sources of

potential recovery previously referenced in Bank Leumi's September 28, 2016 letter to the

Court.   The conduct of Norman in working to put information together for Bank Leumi is a

reflection of his remorse and his true character, especially considering that Norman stands to

receive no reduction of his restitution or forfeiture obligations as a result of any recovery

received by Bank Leumi as a result of his efforts.

      iii.      **Although not the recipient of a 5K1 Letter, Norman D'Souza's Continual Attempts to Assist the Government Should Be A Substantial Factor Taken Into Account By The Court When Assessing Norman D'Souza's Character Pursuant to 18 USC 3553(a)(1)**

Norman's first and only in-person meeting with the Government regarding this matter

took place on June 3, 2015.   At that time, he was in the early stages of coming to grips with the

reality that he had violated criminal laws and faced serious consequences for his actions.   He was

---

[89] See Bank Leumi's letters of September 28, 2016 and November 23, 2016, attached as Exhibits D and E.

Greenbaum Rowe
Smith ■ Davis | LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 36

frustrated and confused by the circumstances in which he found himself - and this frustration and confusion were readily apparent during his proffer session. By way of example, as noted in ¶19 of the PSR, Norman apparently "admitted to the FBI that it was his idea to commit the fraud." In fact, it is undisputed that Norman did not come up with the idea to commit the frauds by MFC.[90] That Norman would purportedly confess to something he didn't do because, under pressure, he wanted to tell the Government what he thought it wanted to hear speaks volumes about him.[91] According to Dr. Barber, this is entirely consistent with her analysis of Norman's nature and characteristics.[92] Norman did not intend to mislead or give inaccurate answers to the Government. In fact, in this instance, it would have been to Norman's benefit to provide information about accounting, financial and other irregularities at MFC of which he was aware.

Following his proffer session on June 3, 2015, the Government communicated to Norman's counsel at the time that Norman was not going to be considered for a 5K1 letter. Norman was disappointed that he would not get the benefit of formally cooperating with the Government, but was equally disappointed because he thought that he would not have the opportunity to provide the Government with everything he knew about the frauds conducted by MFC at the direction of Hussain.

---

[90] See Olender Dep. (Exhibit G), at 88:8-21 where Olender explains that Hussain ran the entire operation at and made all the strategic decisions regarding MFC. Moreover, as Probation noted, Norman did not stand to personally benefit from the schemes orchestrated by MFC, other than keeping his job.
[91] The defense does not contend that the Government induced or persuaded Norman to make such a statement, but to the contrary, that Norman's psychological state was such that he invented a desire of the Government and then attempted to satisfy it.
[92] See Dr. Barber Report (Exhibit F), at 9.

Greenbaum Rowe
Smith ⊠ Davis LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 37

Despite being told he would not receive a 5K1 letter, Norman decided to continue to provide the Government with information regarding the conduct of others involved in frauds conducted by MFC, including additional information regarding his own conduct, which he did not have the opportunity to provide during his proffer session. Norman remains ashamed of his offense conduct and feels terrible that the victims of MFC's frauds sustained significant financial losses. The only solace felt by Norman at this time is that he knows there is no additional information that he could have provided to either the Government or Bank Leumi.

### a.    Legal Standard

It is well-settled in the Second Circuit that, when considering the history and characteristics of a defendant pursuant to §3553(a), a District Court may take into account a defendant's efforts to provide substantial assistance to the Government even if those efforts did not result in the Government making a motion for a downward departure pursuant to U.S.S.G. §5K1.1. U.S. v. Fernandez, 443 F. 3d. 19, 33 (2d. Cir. 2006). Specifically, when performing its analysis pursuant to § 3553(a), the Court may take into account "the history of a defendant's cooperation and characteristics evidenced by cooperation, such as remorse or rehabilitation. Id.

### b.    Norman D'Souza's Efforts to Cooperate with the Government

Norman has provided information to the Government establishing the criminal liability of others involved in the scheme in which Bank Leumi was defrauded. Significantly, the information provided to the Government establishes the criminal liability of others based on documents and, in nearly all instances, would not require the testimony of Norman. The

Greenbaum Rowe
Smith ⬛ Davis | LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 38

substance of the information provided to Government could have been the basis of other prosecutions and, if so used, would have merited Norman receiving a 5K1 letter from the Government.

Norman accepts that it is within the Government's discretion to investigate and decide whether to charge other individuals with criminal conduct. However, the fact that the Government has decided not to use the information provided to it by Norman does not diminish the effort made by Norman to cooperate with the Government, nor does it speak to the strength of the proofs provided by Norman, which are beyond dispute. Norman did more than lay out his opinions; rather, he connected the dots with objective documents proving the veracity of his contentions.

In an effort to provide substantial assistance to the Government, Norman provided a significant amount of material to the Government documenting the criminal conduct of others involved in defrauding Bank Leumi and the city of Gas City, Indiana. This material was provided to the Government by Norman's counsel in both oral presentations and multiple written submissions.[93] The material provided to the Government confirms that Hussain directed and was actively involved in MFC's fraudulent conduct and took steps to conceal it at all relevant times. The materials also confirm the criminal conduct of other individuals at MFC and at other entities related to the frauds perpetrated on Bank Leumi and Gas City.

---

[93] See defense submissions to the Government of August 3, 2016 and August 9, 2016 attached as Exhibits I and J.

Greenbaum Rowe
Smith ▧ Davis|LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 39

        **c.**      **Information provided by Norman D'Souza to the Government establishes the criminal conduct of Hussain.**

It is undisputed that Hussain signed and submitted BBCs to Bank Leumi for the months of January and April of 2014.[94] It is undisputed that these BBCs contained false information. It is further undisputed that Hussain knew the information contained in the BBCs, which he certified was true, was unquestionably false. In addition to signing knowingly false BBCs, there is objective evidence confirming Hussain's actual notice of false information being provided to Bank Leumi in 2012. On November 26, 2012, Hussain and other MFC shareholders were provided with a written summary of findings made by WithumSmith+Brown, PC ("WSB") regarding MFC's financial condition.[95] The summary explicitly confirmed the existence of rampant financial fraud that had been taking place at MFC.[96] In addition to producing a written report, WSB also presented its findings in-person to Hussain.[97] Some of the key findings made by WSB were:

> **"Multiple documents (typically borrowing base certificates) have been fraudulently prepared and submitted to the Company's banking institution in order to increase borrowing limits"**
>
> **"Based on our interviews with management, a culture of acceptance of fraud appears to have been established."**

---

[94] See defense submission to the Government dated August 3, 2016, attached as Exhibit I.
[95] Attached hereto as Exhibit H is a copy of the WSB report dated November 26, 2012. This report was marked as an exhibit at the deposition of Kurt Olender. Both the transcript of Mr. Olender's deposition and the exhibits referenced therein were provided to the Government by Norman's counsel on August 9, 2016.
[96] Id. at pg. 7-8 ("Summary of Key Findings").
[97] Olender Dep. (Exhibit G), at 97:18-24.

Greenbaum Rowe
Smith ▧ Davis|LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 40

Further evidence of Hussain's efforts to defraud Bank Leumi is also seen through agreements negotiated by Hussain with MFC's customers, who made millions of dollars' worth of purchases form MFC, to increase MFC's short-term cash flow in order to keep the business from running out of money.  Despite being provided with clear evidence of Hussain's criminal conduct supported by objective documents, the Government did not seek to pursue charges against Hussain.

On June 6, 2016, when Norman's counsel met with the Government, one of the issues discussed regarding the actionability of the information provided by Norman was the lack of evidence that Hussain had actual knowledge of the falsity of the BBCs he signed and submitted to Bank Leumi. In response, on August 3, 2016, counsel for Norman provided the Government with a written submission containing numerous exhibits, which confirmed that Hussain had actual knowledge of the falsity of the information contained in the BBCs he signed and submitted to Bank Leumi.[98] The information provided by Norman included objective evidence that Hussain enlisted the assistance of another MFC employee to provide inflated figures for the Bank Leumi BBC after Norman refused to do so.[99]

Information submitted to the Government by Norman confirmed that Hussain knew that MFC was sending false BBCs to Bank Leumi in 2012 and that Hussain specifically knew that the BBCs he signed in 2014 were false.  Despite the Government's reluctance to bring criminal charges against Hussain, because Norman provided significant and substantial information

---

[98] See defense's August 3, 2016 submission to the Government, attached as Exhibit I.
[99] Id.

Greenbaum Rowe
  Smith ▨ Davis | LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 41

confirming the criminal conduct of Hussain, the defense respectfully requests that the Court take this into account when assessing Norman's characteristics pursuant to §3553 and crafting an appropriate non-guidelines sentence.

> **2.    The Need for the Sentence to Provide Just Punishment, Adequate Deterrence and Protect the Public.**

The public does not need to be protected from Norman.  Norman is a good man who broke the law based on the misguided belief that doing so for a finite time period would prevent dozens of people, himself included, from losing their jobs while MFC tried to obtain additional financing.  Norman realizes this decision was criminal and foolish.  Norman has learned the hard way that there is no justification for breaking the law.  Sending Norman to prison will not serve to reinforce these lessons. The consequences of his offense conduct will have an impact on him for the rest of his life.  Home confinement is a serious punishment that involves a significant deprivation of liberty.  In addition, as part of accepting financial responsibility for his conduct, Norman will be responsible for significant restitution and forfeiture obligations.

Norman does not need to be sentenced to a period of incarceration in order for the Court to provide just punishment in this matter.  Norman has already suffered meaningful punishment as a result of his guilty plea in this matter and he will continue to deal with the ramifications of his criminal conduct for the rest of his life.  Norman has humiliated himself, his family, his profession and members of his community.  In addition to being humiliated, Norman is no longer able to care for his family.  Norman has not only lost the ability to financially support his

Greenbaum Rowe
Smith ⬛ Davis │LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 42

immediate and extended family, but his guilty plea has prohibited him from traveling to India to

be there for his uncle before he passed away and for his father whose health continues to decline.

Sentencing Norman to a period of incarceration is not necessary to deter him from further

criminal conduct. Norman requires no further deterrence. As noted in the report of Dr. Barber,

the risk of Norman committing similar conduct in the future "is essentially nil."[100] Dr. Barber

further notes that Norman experienced a sharp wakeup call as a result of this matter and now

recognizes "the hazards of his excessive investment in pleasing and serving others."[101] Norman

is committed to following Dr. Barber's recommendation to attend therapy in order to deepen his

self-understanding, better understand the motives of others and better balance his desire to care

for others. As noted by Dr. Barber, it is not realistic that Norman will be able to engage in this

type of therapy if he is incarcerated. Rather, sentencing Norman to a period of home

confinement will provide him with the best opportunity to obtain this type of treatment.

Norman continues to feel extreme remorse for his offense conduct. He is remorseful that

he played a role in MFC's frauds committed against Bank Leumi and Gas City. His remorse led

him to do everything in his power to help Bank Leumi attempt to recover the financial losses it

sustained due to Bank Leumi's fraudulent scheme. As detailed in the letters submitted to the

Court by Bank Leumi, his efforts will play an instrumental role in any future recovery.

In addition, sentencing Norman to a period of incarceration will likely not serve as

general deterrence to the public. Norman is the uncommon individual who committed bank

---

[100] See Dr. Barber Report (Exhibit F), at 12.
[101] Id.

Greenbaum Rowe
Smith ▧ Davis | LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 43

fraud, but had no control over the funds fraudulently obtained and did not benefit from the scheme.

For all of the reasons set forth above and highlighted in this Sentencing Memorandum, sending Norman to prison will be a sentence greater than necessary to comply with the various purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

### 3.      Need to Avoid Unwarranted Sentencing Disparities

Also included among the §3553(a) factors to be considered by the Court at sentencing is the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. §3553(a)(6). Courts in the Second Circuit have observed that the primary purpose underlying §3553(a)(6) is to "reduce unwanted sentence disparities nationwide." United States v. Wills, 476 F.3d 103, 109 (2d. Cir. 2007).

As the Probation department noted in its Presentence Report, Norman did not benefit financially from his role in perpetuating MFC's frauds. Norman also did not seek to obtain the loans for MFC, did not negotiate the terms of the loans and had no control over how the loan proceeds were spent by MFC. In fact, he had no control over MFC in any respect. By virtue of these facts, as well as his lack of any prior criminal history, Norman is extremely unlikely to be similarly situated to other criminal defendants that have pled guilty to bank fraud.

Consequently, we assert that §3553(a)(6) is not a factor that should prevent the Court from sentencing Norman to a non-guideline sentence of home confinement.

### 4.      Need to Provide Restitution.

Greenbaum Rowe
Smith ⬛ Davis LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 44

The final statutory factor required to be considered by the Court at sentencing is the need to provide restitution to victims of the offense. 18 U.S.C. §3553(a)(7).

As part of his plea agreement in this matter, Norman has agreed to be responsible for restitution in the amount of $12,256,871.48. As part of accepting the financial consequences of his actions, Norman is committed to do everything in his power to fulfill his restitution obligation. While it is extremely unlikely that Norman will ever be able to repay his restitution obligation, it should be noted that as a direct result of Norman's efforts, Bank Leumi may recover the entirety of its financial losses. Although Norman does not technically stand to receive credit against his restitution obligation for amounts recovered by Bank Leumi as a result of his efforts, practically speaking, Norman has already made great efforts to put Bank Leumi in a position to receive a substantial financial recovery. As highlighted by the letters provided to the Court by Bank Leumi, Norman takes very seriously his role in making sure that the victims of his criminal conduct recover their financial losses.[102]

Norman is also concerned with the fraudulent conduct of MFC and Echelon, which caused harm to Gas City. While Norman accepts responsibility for acting criminally in enabling MFC and Echelon to present an inaccurate picture of their finances to Gas City, Norman's involvement in this particular fraud was limited. Norman points this out not to avoid responsibility for his restitution obligation to Gas City, but to note that if he had substantial information that would be helpful to Gas City, he would have made efforts to bring it to the attention of Gas City.

---

[102] See letters of Bank Leumi attached hereto as Exhibits D and E.

Greenbaum Rowe
Smith ■ Davis LLP

Hon. Ronnie Abrams, U.S.D.J
November 28, 2016
Page 45

## CONCLUSION

Norman is a man not motivated by greed, manipulated by his corporate superior to act in a way inconsistent with his prior conduct and continuing compassion for others. Incarceration is not necessary for justice to be served in this matter. Therefore, we respectfully request that Your Honor sentence Norman D'Souza to a period of home confinement.

Respectfully submitted,

*Raymond M. Brown*

RAYMOND M. BROWN

Enclosures

cc:    Edward Imperatore, Esq. (via ECF and e-mail)
       Mr. James Mullen, US Probation Officer (via e-mail)